<u>NOT FOR PUBLICATION</u>

UNITED STATE DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LORENZO OLIVER,<br><br>                Plaintiff,<br><br>v.<br><br>MERRILL MAIN, PH.D., JENNIFER VELEZ, LYNN KOVICH, GARY M. LANIGAN, HERBERT SMYCZEK, M.D., KATHLEEN SZOKE, R.N., FUNKE KANJI-OJELADE, R.N., NEW JERSEY DEPRTMENT OF HUMAN SERVICES, NEW JERSEY DIVISION OF MENTAL HEALTH SERVICES, NEW JERSEY DEPARTMENT OF CORRECTIONS, UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY (UMDNJ), and JOHN DOES 1-40, individually and in their official capacities,<br><br>                Defendants. | Civil Action No. 12-03757-SDW-SCM<br><br>**OPINION**<br><br>April 4, 2016 |

**WIGENTON**, District Judge.

Before this Court is the Motion for Summary Judgment of Defendant Kathleen Szoke, R.N. ("Szoke"), and the Motion for Summary Judgment of Defendants University of Medicine and Dentistry of New Jersey ("UMDNJ"), Herbert Smyczek, M.D. ("Smyczek"), and Funke Kanji-Ojelade, R.N. ("Kanji-Ojelade") (collectively, "Defendants"), pursuant to FED. R. CIV. P. 56. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b).

For the reasons discussed below, this Court **DENIES** both Motions.

**FACTUAL BACKGROUND**

Plaintiff Lorenzo Oliver ("Plaintiff") currently resides at the East Jersey Correctional Facility Special Treatment Unit ("STU"), an involuntary and indefinite civil commitment treatment program designed for "sexually violent predators." (Dkt. No. 17 ("Am. Compl.") ¶ 7.) On the morning of May 15, 2011,[1] Defendant Kanji-Ojelade examined Plaintiff in the STU medical unit. (*See* Dkt. No. 106-4, Ex. B at 359-61.) According to the STU's treatment notes, Plaintiff was suffering from a headache, dizziness, elevated blood pressure, and an unsteady gait. (*Id*. at 359.) Plaintiff has described his headache as so severe that it felt as if someone "took a steel rod and pushed it through [his] temple and out into [his] eye." (Dkt. No. 106-4, Ex. C at 39:11-17.) At that point Kanji-Ojelade attempted to call the on-call physician for the STU medical unit, Defendant Smyczek, but he did not answer the call. (Dkt. No. 106-4, Ex. B at 359; Ex. D at 61:8-14.) Kanji-Ojelade then contacted the second on-call physician, who recommended that Plaintiff be given Tylenol and be admitted to the infirmary. (Dkt. No. 106-4, Ex. B at 359-60.) Plaintiff refused both the Tylenol and admission to the infirmary, which he claims was because he feared he was not being treated appropriately. (Dkt. No. 106-4, Ex. C at 49:6-23.) In fact, Plaintiff claims that at that point he repeatedly told Kanji-Ojelade, "You have to get me to the hospital." (*Id*.)

Several hours after refusing to be admitted to the infirmary, Plaintiff returned to the STU medical unit and was again seen by Kanji-Ojelade. (*See* Dkt. No. 106-4, Ex. B at 355-58.) This time, someone took Plaintiff to the medical unit in a wheelchair and Plaintiff told Kanji-Ojelade that he believed he was having a stroke. (*Id*. at 356.) Again, the treatment notes indicate that Plaintiff had elevated blood pressure and an unsteady gait. (*Id*.) In addition, the treatment notes

---

[1] This Court notes that there is a discrepancy in the record as to the date on which Plaintiff first sought treatment for the medical conditions relevant to this matter. For the purposes of this Opinion this Court treats May 15, 2011, as the relevant date.

indicate that Kanji-Ojelade made a second unsuccessful attempt to call Smyczek, this time leaving a voicemail. (*Id*.) At that point, Plaintiff agreed to be admitted to the infirmary. (*Id*.)

At approximately 3:00 p.m. on May 15, 2011, Defendant Szoke took over care of Plaintiff from Kanji-Ojelade and continued that care until 11:00 p.m. (*See* Dkt. No. 106-4, Ex. B. at 352-58.) According to the treatment notes, at 4:00 p.m., Plaintiff "[v]omited [a] large amount of yellow fluid with undigested food," "medication [was] administered," and an EKG was performed. (*Id*. at 352.) Plaintiff was also noted to be suffering from dizziness, nausea, temporary loss of consciousness, weakness, vertigo, abnormal gait, abnormal balance, and left side lower extremity weakness. (*Id.* at 352-53.) Although Smyczek has admitted that many of these symptoms are associated with strokes, (Dkt. No. 106-4, Ex. E at 80:15-81:25), after Szoke notified Smyczek of Plaintiff's status, Smyczek ordered that Clonidine be administered but did not have Plaintiff transferred to a hospital. (Dkt. No. 106-4, Ex. B at 352.) In fact, the treatment notes indicate that at 9:00 p.m. on May 15, 2011, Smyczek ordered that additional Clonidine be administered. (*Id*. at 350.)

At 11:30 p.m. on May 15, 2011, Plaintiff was "found on the floor actively vomiting dark brown liquid . . . . [and] stated he fell out of bed trying to get his basin as he felt 'the floor was the ceiling [and] the ceiling was the floor.'" (*See id.* at 346.) Dr. Smyczek was again notified of Plaintiff's status and ordered additional medication. (*Id*.) According to Smyczek, he ordered that Clonidine be administered for Plaintiff's high blood pressure, and he also ordered that Phenergan and Meclizine be administered for Plaintiff's nausea and vomiting. (Dkt. No. 102, Traina Cert. ¶ 8.)

Plaintiff's symptoms appear to have continued throughout the night and at 7:00 a.m. on May 16, 2011, it was noted that Plaintiff's left eye was drooping. (*See* Dkt. No. 106-4, Ex. B at

346.) At 8:43 a.m., Mushtaq Memon, M.D., noted that Plaintiff exhibited dizziness, weakness in his left side (including facial weakness), difficulty walking, drooping of his left eye, and "flat [left] angle of mouth." (*Id.* at 345.) Plaintiff was also unable to whistle. (*Id.*) At that point Dr. Memon agreed to transfer Plaintiff to a hospital to rule out a possible stroke. (*Id.*)

Treatment notes from Plaintiff's hospital discharge on May 18, 2011, indicate that Plaintiff's diagnosis was an "[a]cute cerebrovascular accident with left-sided facial weakness." (*Id.* at 326.) Plaintiff claims, and Defendants concede in their Answers, that Plaintiff was diagnosed as having suffered from a stroke. (Am. Compl. ¶ 20; Dkt. No. 33 ¶ 20; Dkt. No. 12 ¶ 19.) Although there now seems to be some dispute as to whether Plaintiff did actually suffer a stroke, (*see* Train Cert. ¶ 12), Plaintiff also submitted an examination report from Roger Behar, M.D., a neurologist who is licensed to practice medicine in New Jersey, which confirms the stroke diagnosis. (*See* Dkt. No. 107-3 Ex. F ("Behar Report"); Dkt. No. 106-2 ("Behar Cert.") ¶¶ 1, 3.) According to Dr. Behar's report, an MRI scan from May 17, 2011, shows that Plaintiff suffered "an acute stroke in the left mid and lower medulla." (Behar Report 5.) Dr. Behar's report also concludes: "it appears that the nurses and doctor on call at the Special Treatment Unit should have referred Mr. Oliver to a hospital immediately upon hearing him complain of the worst headache of his life, and seeing that he exhibited acute vestibular symptoms and an unsteady gait." (Behar Report 6.) In addition, Plaintiff submitted a certification from Teri Cox, R.N., stating that "there exists a reasonable probability that the care, skill or knowledge exercised or exhibited by [Szoke and Kanji-Ojelade in treating Plaintiff] . . . fell outside acceptable professional or occupational standards or treatment practices." (Dkt. No. 103-7, Ex. D ¶ 5.) Finally, Plaintiff claims that he suffered severe physical injuries and emotional harm as a result of Defendants' actions and delay in referring Plaintiff to a hospital. (Am. Compl. ¶ 4.)

**PROCEDURAL HISTORY**

Plaintiff filed an Amended Complaint in this matter on October 9, 2012. (Dkt. No. 17.) The Amended Complaint alleges negligence, medical malpractice, and violation of Plaintiff's rights pursuant to 42 U.S.C. § 1983. (Am. Compl. ¶¶ 27-37, 40-44.) In addition, the Amended Complaint seeks punitive damages. (Am. Compl. ¶¶ 38-39.)

On September 24, 2013, U.S. District Judge Dennis M. Cavanaugh issued an Order dismissing Plaintiff's medical malpractice claims against all defendants other than Smyczek, Szoke, Kanji-Ojelade, and UMDNJ. (Dkt. No. 61.) In addition, Judge Cavanaugh dismissed Plaintiff's § 1983 claims against all defendants, but later reinstated Plaintiff's § 1983 claims against Defendants Smyczek, Szoke, and Kanji-Ojelade "in their individual capacities." (Dkt. No. 68.)[2]

On October 15, 2015, Defendants UMDNJ, Smyczek, and Kanji-Ojelade moved for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 102.) On October 16, 2015, Szoke also moved for summary judgment. (Dkt. No. 103.) Plaintiff filed briefs in opposition to both Motions on November 20, 2015. (Dkt. Nos. 106, 107.) Szoke filed a reply on December 2, 2015, (Dkt. No. 108); and UMDNJ, Smyczek, and Kanji-Ojelade filed a reply on December 3, 2015, (Dkt. No. 109).

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

---

[2] Although Judge Cavanaugh's September 24, 2013 Opinion left Plaintiff's negligence claims against all defendants intact, it appears that all defendants other than Szoke, Smyczek, Kanji-Ojelade, and UMDNJ were subsequently terminated from this matter. In addition, neither the docket nor the parties' briefings currently before this Court appear to contain any reference to whether Plaintiff is still pursuing his negligence claims against any of the remaining defendants.

5

56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the non-moving party to set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions, or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The non-moving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the non-

moving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322-23.) If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23.

Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The non-moving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. Appx. 548, 554 (3d Cir. 2002).

**DISCUSSION**[3]

**I.      Dr. Behar's Ability to Testify as an Expert under N.J. STAT. ANN. § 2A:53A-41**

The first issue before this Court is whether Roger Behar, M.D., a neurologist licensed to practice medicine in New Jersey, may testify as to the appropriate standard of care Defendants owed Plaintiff. Defendants argue that Dr. Behar is barred from testifying as to the appropriate standard of care because Defendants are "specialists" under N.J. STAT. ANN. ("N.J.S.A.") § 2A:53A-41(a). (*See* Br. Supp. Defs.' Mot. Summ. J. ("Smyczek's Br. Supp.") 3-7; Mem. Law Supp. Def. Szoke's Mot. Summ. J. ("Szoke's Br. Supp.") 10-11.) Accordingly, Defendants claim Dr. Behar may not testify because section 41(a) requires that "the person providing the testimony

---

[3] This Court notes that counsel for Defendants UMDNJ, Smyczek, and Kanji-Ojelade did not submit a statement of undisputed material facts as is required by Local Civil Rule 56.1. Although this Court does not deny Defendants' Motion on that basis, and it could, this Court reminds counsel that any future motions for summary judgment submitted to this Court must be accompanied by a statement of undisputed material facts.

7

shall have specialized . . . in the same specialty or subspecialty." *See* N.J.S.A § 2A:53A-41(a). As a result, Defendants argue, they are entitled to summary judgment on Plaintiff's medical malpractice claims.

In opposition, Plaintiff argues that Defendants are not "specialists," but instead, are "general practitioner[s]" under N.J.S.A. § 2A:53A-41(b). (*See* Pl.'s Br. Opp. to Mot. Summ. J. of Szoke ("Pl.'s Br. Opp. Szoke") 7-11; Pl.'s Br. Opp. to Mot. Summ. J. of UMDNJ, Smyczek, and Kanji-Ojelade ("Pl.'s Br. Opp. Smyczek") 9-20.) Plaintiff claims that Dr. Behar is qualified to testify under section 41(b) because he "devoted a majority of his professional time to . . . active clinical practice that encompasses the medical condition . . . that is the basis of the claim or action." *See* N.J.S.A. § 2A:53A-41(b)(1). As Defendant Smyczek is a physician and Defendants Kanji-Ojelade and Szoke are nurses, this Court addresses Dr. Behar's testimony regarding Defendant Smyczek separately.

### A. Dr. Behar's Testimony as to Defendant Smyczek

N.J.S.A. § 2A:53A-41 establishes criteria for who may provide expert testimony on the "appropriate standard of practice or care" in medical malpractice cases. In addition to requiring that an expert be "licensed as a physician or other health care professional in the United States," the statute requires that a testifying expert meet other criteria depending on whether the "party against whom . . . the testimony is offered . . . is a specialist . . . subspecialist . . . . [or] general practitioner." *Id*. §§ 41(a), 41(b). Specifically, section 41(a) of the statute provides:

> If the party against whom . . . the testimony is offered is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association and the care or treatment at issue involves that specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association, the person providing the testimony shall have specialized at the time of the occurrence that is the basis for the action in the same specialty or subspecialty, recognized by the American Board of Medical Specialties

8

> or the American Osteopathic Association, as the party against whom or on whose behalf the testimony is offered . . . .[4]

*Id*. § 41(a). In light of these requirements, Defendant Smyczek claims he is a family medicine specialist and that Dr. Behar cannot testify as to the standard of care Smyczek owed Plaintiff because a challenging expert must practice in the same specialty. (Smyczek's Br. Supp. 3-7.) Plaintiff, does not dispute whether Smyczek is a specialist under section 41(a). (*See* Pl.'s Br. Opp. Smyczek.) Nonetheless, Plaintiff claims section 41(a) is inapplicable because "the care or treatment at issue" did not "involve" the family medicine specialty as section 41(a) requires. (*Id*. at 10.) Thus, this Court must determine whether the care at issue in this instance, diagnosing and treating Plaintiff's stroke, involved Defendant Smyczek's family medicine specialty.

Family medicine, as described by the American Board of Medical Specialties, is extremely broad:

> Family physicians deliver a range of acute, chronic and preventive medical care services. In addition to diagnosing and treating illness, they also provide preventive care, including routine checkups, health-risk assessments, immunization and screening tests, and personalized counseling on maintaining a healthy lifestyle. Family physicians also manage chronic illness, often coordinating care provided by other subspecialists.

AMERICAN BOARD OF MEDICAL SPECIALTIES MEMBER BOARDS, FAMILY MEDICINE, http://www.abms.org/member-boards/contact-an-abms-member-board/american-board-of-family-medicine/ (last visited Apr. 1, 2016) ("ABMS Family Medicine Definition"); *see also Nicholas v. Mynster*, 64 A.3d 536, 540 n.2 (N.J. 2013) (relying on the same definition of family

---

[4] N.J.S.A. § 2A:53A-41(a) also provides additional criteria an expert witness must meet when the party against whom the testimony is offered is a *board-certified* specialist. Defendant Smyczek claims to be board-certified at points in his Motion as well as in his interrogatory response. (*See, e.g.*, Smyczek's Br. Reply 7; Dkt. No. 109-3 ¶ 1.) However, this claim is in apparent contradiction of both Smyczek's deposition testimony and his curriculum vitae. (*See* Dkt. No. 106-4, Ex. E 19:22-20:7; Dkt. No. 107-3, Ex. G.) As the burden of showing that Plaintiff cannot succeed on his medical malpractice claim at trial is on the Defendants, this Court treats Dr. Smyczek as lacking a board certification in family medicine.

medicine).[5] In *Nicholas v. Mynster*, for example, the Supreme Court of New Jersey held that an attending physician's care of a patient suffering from carbon monoxide poisoning involved family medicine. 64 A.3d at 551. Specifically, the family-care specialist consulted with an emergency-medicine specialist, had the patient admitted to a hospital, and "augmented [the patient's] medications." *Id*. According to the *Nicholas* Court, "[t]his treatment . . . fell within the broad range of services rendered by family-medicine specialists." *Id*.

In this instance, Plaintiff suffered from a stroke. (Am. Compl. ¶ 20; Dkt. No. 33 ¶ 20; Dkt. No. 12 ¶ 19.) Although it appears that Defendant Smyczek misdiagnosed Plaintiff's illness, he claims to have directed the nurses at the STU to perform an EKG and to administer several medications: "Clonidine to treat high blood pressure, and Phenergan and Meclizine to treat nausea and vomiting." (Traina Cert. ¶ 8.) As "[f]amily physicians deliver a range of acute, chronic and preventive medical care services," Defendant Smyczek's "care or treatment" therefore involved that specialty. *See* ABMS Family Medicine Definition. Thus, only someone who "specialized [in family medicine] at the time of the occurrence that is the basis for th[is] action" may testify as an expert on the standard of care Defendant Smyczek owed Plaintiff. N.J.S.A. § 2A:53A–41(a). Accordingly, Dr. Behar, as a neurologist, may not testify as to that standard of care.

In light of this holding, this Court grants Plaintiff thirty days from the date of this Opinion to find an appropriate expert. Although Defendant Smyczek urges this Court to grant him summary judgment on Plaintiff's medical malpractice claim, Defendant Smyczek had not

---

[5] Although the American Board of Family Medicine provides a more narrow definition of "family medicine," New Jersey courts have not adopted that definition in applying N.J.S.A. § 2A:53A-41. Moreover, even under the American Board of Family Medicine's definition, this Court's determination under N.J.S.A. § 2A:53A-41 would be the same. *See* AMERICAN BOARD OF FAMILY MEDICINE, DEFINITIONS & POLICIES, *https://www.theabfm.org/about/policy.aspx* (last visited Apr. 1, 2016) ("Family medicine . . . provides continuing, comprehensive health care for the individual and family. It is a specialty in breadth that integrates the biological, clinical and behavioral sciences. The scope of family medicine encompasses all ages, both sexes, each organ system and every disease entity.").

previously given Plaintiff ample opportunity to determine what, if any, specialty Defendant Smyczek has.[6] Therefore, Defendant Smyczek's Motion is denied as to Plaintiff's medical malpractice claim.[7]

### B. *Dr. Behar's Testimony as to Defendants Szoke and Kanji-Ojelade*

In contrast to Defendant Smyczek, Defendants Szoke and Kanji-Ojelade are registered nurses, to which N.J.S.A. § 2A:53A-41(a) does not apply. *See Lomando v. United States*, 667 F.3d 363, 387 (3d Cir. 2011) ("N.J. Stat. Ann. § 2A:53A–41(a) applies only to physicians."); *see also Lauckhardt v. Jeges*, No. A-1970-13T4, 2015 WL 6132987, at *8 (N.J. Super. Ct. App. Div. Oct. 20, 2015) ("N.J.S.A. 2A:53A-41(a) does not apply to [defendant nurses]."). Therefore, this Court must determine whether N.J.S.A. § 2A:53A-41(b) applies and, if so, whether Dr. Behar's testimony would satisfy its criteria. N.J.S.A. § 2A:53A-41(b) states in full:

> b. If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to:
>
> (1) active clinical practice as a general practitioner; or active clinical practice that encompasses the medical condition, or that includes performance of the procedure, that is the basis of the claim or action; or
>
> (2) the instruction of students in an accredited medical school, health professional school, or accredited residency or clinical research program in the same health care profession in which the party against whom or on whose behalf the testimony is licensed; or

---

[6] Although Defendant Smyczek's response to Plaintiff's interrogatory states Defendant Smyczek is "board certified by The American Board of Family Practice . . . .," (Dkt. No. 109-3 ¶ 1), Smyczek's deposition testimony states that he let his certification "lapse about ten years ago." (Dkt. No. 106-4, Ex. E at 19:22-20:2-7.) Additionally, Defendant Smyczek's curriculum vitae does not reference a family medicine board certification, (Dkt. No. 107-3, Ex. G), and Smyczek's Answer does not disclose a specialty, (*see* Dkt. No. 33).

[7] Insofar as it is unclear from the record whether Plaintiff has submitted an affidavit of merit regarding Plaintiff's medical malpractice claim against Defendant Smyczek, this Court reminds Plaintiff that N.J.S.A. § 2A:53A-27 requires Plaintiff to supply each defendant with an affidavit from an "appropriate licensed person."

(3) both.

Therefore, this Court must first determine whether Defendants Szoke and Kanji-Ojelade are "general practitioner[s]" under section 41(b).

In *Harbeson v. Underwood-Mem'l Hosp.*, the Superior Court of New Jersey, Appellate Division, held that a registered professional nurse was a general practitioner under section 41(b). No. A-2151-08T2, 2009 WL 1766598, at *9 (June 24, 2009). Although *Harbeson* is an unpublished opinion, the New Jersey Supreme Court has not ruled on whether section 41(b) applies to nurses, and *Harbeson* is therefore the best indication of how the New Jersey Supreme Court would rule on this issue. *See Lomando*, 667 F.3d at 385-86 (3d Cir. 2011) ("In the absence of a controlling decision by the [New Jersey] Supreme Court, we must predict how it would rule if faced with the issue . . . . [by] look[ing] to decisions of state intermediate appellate courts [and other sources]." (internal quotation marks and citations omitted)). Furthermore, the inclusion of nurses as general practitioners is supported by the preamble to N.J.S.A. § 2A:53A-41, which states:

> In an action alleging medical malpractice, a person shall not give expert testimony . . . on the appropriate standard of practice or care unless the person is licensed as a physician *or other health care professional* in the United States and meets the following criteria:

N.J.S.A. § 2A:53A-41 (emphasis added and citation omitted). Although the preamble refers to the expert witness supplying the testimony, as opposed to the party against whom the expert testifies, the preamble contemplates that "other health care professional[s]" (i.e., non-physicians) can testify in some circumstances. Had the Legislature intended the requirements of section 41 to apply only to testimony against physicians then the Legislature would likely have limited the pool of potential expert witnesses to physicians as well. *See* N.J. Assemb. Comm. Statement, A.B. 50, (2004) (stating that N.J.S.A. § 2A:53A-41 "provides that an expert must have the same type of practice and possess the same credentials . . . as the defendant health care provider, unless waived by the

court.") Therefore, this Court finds, in accordance with the holding in *Harbeson*, that Defendants Szoke and Kanji-Ojelade are general practitioners under section 41(b).[8] In light of this finding, this Court must next determine whether Dr. Behar's testimony as to Defendants Szoke and Kanji-Ojelade would meet the criteria for expert testimony set out in N.J.S.A. § 2A:53A-41(b).

Under N.J.S.A. § 2A:53A-41(b)(1), an expert may testify as to the standard of care owed by a party if, "during the year immediately preceding the date of the occurrence that is the basis for the claim or action[,] . . . [the expert] devoted a majority of his professional time to . . . active clinical practice . . . that encompasses *the medical condition . . . that is the basis of the claim or action*." (emphasis added). In this instance, Plaintiff bases his claim on Defendants' failure to properly diagnose and treat Plaintiff's stroke. (*See* Pl.'s Br. Opp. Smyczek 1; Pl.'s Br. Opp. Szoke 1). In addition, Dr. Behar certified to this Court that in the year immediately preceding the date of Plaintiff's stroke, Dr. Behar "devoted a majority of [his] professional time to the practice of neurology and, in that practice, treated many patients suspected of having an acute stroke." (Behar Cert. ¶ 8.) Therefore, Dr. Behar's clinical practice during the relevant time period encompassed the medical condition at issue. Accordingly, although Dr. Behar is a neurologist, his experience in treating strokes in the year before Plaintiff's stroke satisfies the criteria for expert testimony under section N.J.S.A. § 2A:53A-41(b). *See Lomando*, 667 F.3d at 385-86 ("If the language is plain and clearly reveals the statute's meaning, the Court's sole function is to enforce the statute according to its terms." (citing *Frugis v. Bracigliano*, 827 A.2d 1040, 1058 (N.J. 2003))); *see also O'Connell v. State*, 795 A.2d 857, 859 (N.J. 2002) ("A court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that

---

[8] This Court notes that even if Defendants Szoke and Kanji-Ojelade were not general practitioners under N.J.S.A. § 2A:53A-41(b), this Court would still deny Defendants' Motions as to Plaintiff's medical malpractice claims because N.J.S.A. § 2A:53A-41 would then simply be inapplicable to Dr. Behar's testimony against Szoke and Kanji-Ojelade.

expressed by way of the plain language."). Therefore, this Court denies Defendant Szoke's and Defendant Kanji-Ojelade's Motions as to Plaintiff's medical malpractice claims.

## II.     Plaintiff's Claims under 42 U.S.C. § 1983

In addition to his other claims, Plaintiff alleged in his Amended Complaint that Defendants Smyczek, Szoke, and Kanji-Ojelade violated his rights under the Due Process Clause of the Fourteenth Amendment by failing to provide Plaintiff with adequate medical care. (Am. Compl. ¶ 41.) In support of their Motions, Defendants argue that they are entitled to summary judgment on Plaintiff's § 1983 claims because they did not act with "deliberate indifference" to Plaintiff's medical needs in violation of the Eighth Amendment. (*See* Smyczek's Br. Supp. 8-11; Szoke Br. Supp. 16-17.) As discussed below, the deliberate indifference standard—which courts apply to convicted prisoners—is inapplicable in this case because Plaintiff is civilly committed. As Defendants rely on the wrong legal standard in opposing Plaintiff's § 1983 claims, they cannot satisfy their burden of showing that they are entitled to summary judgment. Moreover, even if Defendants had argued under the proper standard, summary judgment on Plaintiff's § 1983 claims is inappropriate because a genuine issue of material fact exists.

In *Youngberg v. Romeo*, in which the Supreme Court considered the standard of care owed to civilly committed individuals, the court noted that medical care is one of "the essentials of the care that the State must provide." 457 U.S. 307, 324 (1982). Thus, to determine whether a defendant's deficient care has violated a civilly committed individual's "substantive right protected by the Due Process Clause . . ., it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Id.* at 320 (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). In performing this analysis, the Supreme Court rejected the Eighth Amendment "deliberate indifference" standard of liability and, instead, outlined a "professional

14

judgment" standard courts must apply in the context of § 1983 claims by those who are civilly committed:

> [T]he Constitution . . . requires that the courts make certain that *professional judgment* in fact was exercised . . . . *Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish* . . . . [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Youngberg*, 457 U.S. at 321-23 (internal quotation marks and citations omitted) (emphasis added).

This professional judgment standard applies to § 1983 medical claims by civilly committed individuals like Plaintiff. *See, e.g.*, *Deavers v. Santiago*, 243 F. App'x. 719, 722 (3d Cir. 2007) (applying the professional judgment standard to a civilly committed sexually violent predator's § 1983 claim). Accordingly, to establish a § 1983 claim at trial, Plaintiff would need to show that Defendants' actions were akin to recklessness or gross negligence. *See Shaw v. Strackhouse*, 920 F.2d 1135, 1146 (3d Cir. 1990) ("Professional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct.").

To succeed on their Motions now before this Court, Defendants would need to show that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law under the professional judgment standard. In other words, Defendants would be required to show that their actions in treating Plaintiff did not amount to recklessness or gross negligence. *See Shaw*, 920 F.2d at 1145; *Hasher v. Hayman*, No. 08-4105, 2013 WL 1288205, at *1 (D.N.J. Mar. 27, 2013) (applying the professional judgment standard to a § 1983 claim by a civilly committed sexually violent predator). However, Defendants do not argue that their actions satisfied the professional judgment standard. (*See* Smyczek's Br. Supp. 8; Szoke Br. Supp. 16.) Rather, Defendants argue that they were not deliberately indifferent to Plaintiff's serious medical needs.

(*See* Smyczek's Br. Supp. 11; Szoke Br. Supp. 17.) Therefore, Defendants cannot meet their burden of showing that there is no genuine issue of material fact as to whether they exercised professional judgment in treating Plaintiff.

In addition, even if Defendants had argued under the professional judgment standard, summary judgment would still be inappropriate. Plaintiff has submitted evidence supporting his claim that he repeatedly told the nurses in the STU medical unit that he believed he was suffering from a stroke. (Dkt. No. 106-4, Ex. C. at 45:7-47:2; 49:6-23.) Plaintiff also submitted evidence showing that Defendant Smyczek repeatedly failed to respond to Defendant Kanji-Ojelade's phone calls despite being the attending physician, and that Defendant Smyczek was aware that Plaintiff's symptoms were stroke symptoms. (*See* Dkt. No. 106-4, Ex. B at 355, 359; Ex. D at 61:8-14; Ex. E at 80:15-81:25.) Finally, Plaintiff submitted evidence from an expert supporting Plaintiff's claim that he did in fact have a stroke, and also, that Plaintiff suffered greater harm because it took so long for him to be sent to the hospital. (*See* Behar Report.) In construing the evidence in the record in the light most favorable to Plaintiff, this Court finds that there is evidence in the record from which a reasonable jury could find that Defendants' actions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [Defendants] actually did not base the[ir] decision[s] on such . . . judgment." *Youngberg*, 457 U.S. at 323. Accordingly, this Court denies Defendants' Motions as to Plaintiff's § 1983 claims.

**CONCLUSION**

For the reasons stated above, this Court **DENIES** Defendants' Motions for Summary Judgment.[9]

---

[9] This Court reserves any *Daubert* considerations regarding the parties' experts for a time closer to trial.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig: Clerk
cc: Magistrate Judge Steven C. Mannion
Parties